UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| **BOOTHEEL ETHANOL INVESTMENTS, L.L.C.,** | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 1:08-CV-59 SNLJ ) |
| **SEMO ETHANOL COOPERATIVE, ET AL.,** | ) ) ) ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

Plaintiff has filed this contract and tort action against defendants in connection with certain financial transactions concerning their limited liability company, Bootheel Ethanol, L.L.C. This matter is before the Court on the defendants' Motion for Summary Judgment (#74), filed May 9, 2011. Responsive pleadings have been filed, and the matter is now ripe for disposition.

**I.      Factual Background**

The following facts are uncontested except where indicated. The plaintiff and defendant were the two sole members of Bootheel Ethanol, L.L.C., a limited liability company created under the laws of Missouri. During the relevant time period, plaintiff Bootheel Ethanol Investments ("BEI") was the minority (49%) member of Bootheel Ethanol, L.L.C. ("Bootheel") and defendant SEMO Ethanol Cooperative ("SEMO") was the majority (51 %) member.[1] The

---

[1] The other defendants are the members of defendant SEMO's board of directors: Quincy Murphy, Mike Mills, John Story, Marty Hutcheson, and Dale Mayberry. They will be hereinafter be collectively referred to as the "individual defendants."

parties formed Bootheel to build and operate an ethanol-manufacturing facility in Malden, Missouri. They entered into an Operating Agreement which provides that the Agreement and Bootheel LLC "shall be governed by the laws of the State of Missouri."

Under the Operating Agreement, the parties agreed to make initial capital contributions as follows: BEI - $3,866,000.00 and SEMO - $4,023,900.00. Both parties made their respective capital contributions into escrow accounts. Because SEMO was organized as a New Generation Cooperative under § 348.432 RSMo (which allowed it to take advantage of certain tax incentives), SEMO was subject to certain limitations on its investment in Bootheel. As a result, SEMO established an escrow account where its members' investments were deposited, and the funds in that escrow account were subject to an Escrow Agreement with the bank.  Certain events had to take place before the money could be released from escrow. Ultimately, the idea behind the escrow account was to hold the invested money until the ethanol plant was sure to become a reality — as evidenced by proof of, for example, debt financing and construction contracts — and, when those and other certain conditions were met, the money in the escrow account could be released to SEMO's "operating account."[2]  Interest on the escrow account, however, could be deposited in SEMO's operating account in the meantime.

According to the Escrow Agreement, (1) there were no third party beneficiaries to the Escrow Agreement; (2) no creditor of SEMO had any right to proceeds in the account; and (3)

---

[2]This description is a gross understatement of the complexities behind the requirements for a "New Generation Cooperative" and its limitations on investment. Suffice to say, however, that certain conditions had to be met before SEMO could access the principal of its members' investments in order to qualify for the incentive tax credit program, and it is undisputed that those conditions were never met.

although the interest accrued on the account was to be released to SEMO, in the event that SEMO's "Board of Directors determines in its sole discretion that the proceeds should be returned to the subscribers ..., the Bank shall promptly return the proceeds without interest to the subscribers."

The above arrangements — the Agreements and escrow deposits — were made in 2001. At some point, Bootheel required additional funding. Pursuant to the Operating Agreement, members are authorized to loan money to Bootheel; thus, between September 2005 and December 2006, BEI alleges that it made loans to Bootheel totaling $1,276,000.00. (It is not clear to the Court just how much money SEMO actually contributed to Bootheel operations, although it appears SEMO contributed interest earned from its escrow account.)  Also, pursuant to § 6.2.3 of the Operating Agreement, "Unless otherwise agreed by the Operating Manager and the lending party, all such loans (I) shall be payable only from the assets of the Company without any recourse against or any right of contribution from any Member." Operating Manager Bill Adcock testified that he, acting on behalf of Bootheel and under the "otherwise agreed" clause of § 6.2.3, agreed with BEI (through BEI's manager, David O'Neill) that the loans would be repaid from SEMO's capital contributions if other funds were not available. O'Neill or his enterprises were apparently the source of the loans.  SEMO disputes that the loan arrangement ever existed.[3]

---

[3]However, according to plaintiff, SEMO Board of Director meeting minutes indicate that SEMO's Board "agreed unanimous[ly] to allow O'Neill to loan money for operating costs" on May 24,2001.  Plaintiff also contends that the SEMO shareholders were informed at the May 24, 2006 shareholder meeting that (1) Bootheel had $60,000 in outstanding bills, (2) "O'Neill is responsible for 49% of those bills and the coop is also responsible for 51% of the money that O'Neill has contributed to pay the past bills," (3) the "shareholder account [presumably the Escrow Account] would not be broken until a firm term sheet has been signed and construction contracts are in place... [but] that if the project was to fold it would take about $5,000 per share to cover the bills."  The shareholder meeting minutes also state that a "motion was made by Jerry

On September 6, 2006, SEMO voted to dissolve, and the bank began distributing the escrowed funds on September 7. The parties dispute how the funds were distributed — defendants state that the funds were distributed directly to SEMO members (and not to SEMO), but plaintiff states that SEMO had control of the money and attaches a copy of a check for $3,083,897 to the bank for the purchase of money orders for distribution of the funds to SEM) members.[4] Plaintiff alleges that SEMO has not repaid its portion of BEI's loans to Bootheel.

In its amended complaint, plaintiff alleges claims of breach of contract against defendant SEMO (Count I) and fraudulent conveyance by the individual defendants (Count II).

## II.    Summary Judgment Standard

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. *New England Mut. Life Ins. Co. v. Null*, 554 F.2d 896, 901 (8th Cir. 1977). Pursuant to Federal Rule Civil Procedure 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."

---

Elder to disband and take what money is left after any bills and give it back to the shareholders." Defendants objected to plaintiff's inclusion of those facts on the basis that the "meeting minutes" were not authenticated.  Further, defendants suggest through reference to the deposition of John Story (SEMO's Secretary) that the shareholder meeting minutes were fabricated, but defendants do not appear to have provided correct meeting minutes for that shareholder meeting. As a result of plaintiff's failure to lay a proper foundation for the meeting minutes, the Court will disregard them for the purpose of summary judgment.  However, plaintiff established through testimony that there is at least a question of fact as to whether SEMO knew it was responsible for the loans provided by BEI.

[4]Plaintiff attaches a copy of the check from SEMO to the bank as well as a "Purchaser's Receipt" that shows what is apparently a bank money order purchased by SEMO.

*Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207,210 (8th Cir. 19176). With these principles in mind, the Court turns to the discussion.

**III.    Discussion**

Defendants seek summary judgment on both remaining claims in this case — first, on plaintiffs breach of contract claim, and second, on plaintiff's fraud claim. In addition, defendants argue that plaintiff's case should be dismissed with prejudice as a sanction stemming from plaintiffs alleged spoliation of evidence in this matter. Defendants have file a separate motion seeking that sanction, and others, as a result of that alleged spoliation in their Motion to Compel (#80), which will be addressed by separate order. The Court notes that, as a preliminary matter, in this diversity lawsuit, the Court applies the substantive law of the state in which the

5

district court sits. *Urban Hotel Dev. Co. v. President Dev. Co., L.C*, 535 F.3d. 874, 877 (8th Cir. 2008); *Roemmich v. Eagle Eye Dev. L.L.C.*, 526 F.3d. 343, 348 (8th Cir. 2008). In the present case, Missouri substantive law applies.

### A. Breach of the Alleged Oral Contract Between BEI and Bootheel

No one disputes that BEI provided an infusion of cash to Bootheel totaling somewhere around $1,276,000. The question, rather, is whether BEI is entitled to be repaid to some extent by SEMO (or its successors).  Defendants naturally insist that they are not obligated to repay BEI's "loans" to Bootheel, and that they are thus entitled to summary judgment, because (1) Bootheel (through Adcock) and BEI (through O'Neill) did not agree on the terms of the alleged oral agreement such that there was no meeting of the minds and thus no oral agreement, (2) Bootheel's and BEI's records and actions suggest that the loans were actually capital contributions, not loans that required repayment, (3) the Operating Agreement prohibited the oral agreement because the alleged oral agreement would have required SEMO to violate its Escrow Agreement, (4) Bootheel never treated SEMO's capital contribution as a capital contribution and thus it was never subject to use to repay the alleged loans, and/or (5) Adcock (as Bootheel's Operating Manager) had no power to agree that the SEMO members would repay the loans to Bootheel. Each of defendants' arguments is discussed in turn below.

#### 1. Terms of the Alleged Oral Contract

Defendants first claim that the precise terms of the oral contract were not certain, so there could be no "meeting of the minds," and thus no oral contract existed at all.

"To show 'a meeting of the minds,' the plaintiff must show that the terms of the contract were certain or capable of being made certain." *Tom's Agspray, LLC v. Cole*, 308 S.W.3d 255,

259 (Mo. Ct. App. 2010). "To determine whether a meeting of the minds has occurred and an agreement has been reached, the court looks to the intention of the parties as expressed or manifested in their words or acts." *Karsch v. Carr*, 807 S.W.2d 96, 99 (Mo. Ct. App. 1990).

Defendants rely on *Dennis Chapman Toyota, Inc. v. BeIle State Bank*, in which the Missouri Court of Appeals noted that "an essential characteristic of an enforceable contract is that its obligations be specifically described in order to enable a court or trier of fact to ascertain what it was the promisor undertook to do." 759 S.W.2d 330, 335 (Mo. Ct. App. 1988) (internal quotations omitted). There, a car dealership claimed that a bank had breached an oral contract to loan money, but the terms of the purported oral contract were unclear: there was no agreed upon interest rate, no terms for repayment, and no duration of the line of credit. The Court held that, therefore, "the oral contract sued upon was too indefinite to be enforced" and stated "we cannot make indefinite parts of a contract definite where there is no showing that a definite intention was present." *Id.* at 336.

Defendants contend that plaintiff's purported oral contract here is similarly bereft of definite terms. In support, defendant notes that Adcock (Operating Manager for Bootheel) and O'Neill (acting for BEI) themselves had different views on the terms of the loans. Adcock stated in his deposition that the oral agreement regarding the loans contained the same terms as did certain other promissory notes between O'Neill and Bootheel in 2003. (Those loans that were the subject of the promissory notes are not at issue in this case; the alleged loans that are at issue in this case were not documented with promissory notes.) The promissory notes indicated that the interest rate was eight percent per annum, with interest payable on a monthly basis beginning one month after the date of the note, and the loans were payable fourteen months after they were

made. According to the terms of the notes, the General Manager was "authorized and directed by a Resolution of the Board of Directors" of SEMO "to execute this promissory note on behalf of" Bootheel. The promissory notes specifically provided that the money received was a loan, and not an equity contribution to Bootheel. Adcock also stated that according to the terms of the oral agreement, the loans would be repaid by the assets out of escrow, or, in Adcock's words, SEMO's capital contributions.

 O'Neill, on the other hand, testified somewhat differently as to his understanding of the loan terms. O'Neill did not even ask for promissory notes, as he believed that the terms of the loans were set by the Operating Agreement; thus his version of the oral agreement had a different interest rate than Adcock's version of the oral agreement, a different due date for the loans, and (defendants argue) possibly a different source for repayment — O'Neill believed that Bootheel was responsible to repay the loans, but he thought that the SEMO would be required to repay the loans if Bootheel could not.

 Defendants insist that the foregoing facts demonstrate that essential terms such as the interest rate, payment date, due date, and obligated party were omitted from the oral agreement, that there was no meeting of the minds between Adcock and O'Neill, and thus no oral agreement existed.

 Plaintiff responds that, simply, BEI and Bootheel intended to enter into a series of loans to cover Bootheel's operating expenses. O'Neill and Adcock both understood that because the Operating Agreement required that the 49%/51% equity stake be preserved, the infusion of money had to be considered a loan and not a capital contribution — thus, plaintiff argues, there was no question that the funds provided by BEI were loans. Second, plaintiff contends that BEI

8

and Bootheel agreed that if no other sources of funds existed to pay back the loans, then SEMO would be liable to pay its share (51 %) to BEI. Plaintiff also states that SEMO's board members told Adcock and/or O'Neill that they would be responsible for their share of the loans if the project failed.

In addition, plaintiff asserts that to the extent there was ambiguity regarding the terms of the loans, the Operating Agreement provides any missing, necessary terms. Indeed, the Operating Agreement states at § 6.2.3 that

> Unless otherwise agreed by the Operating Manager and the lending party, all such loans (I) shall be payable only from the assets of the Company without any recourse against or any right of contribution from any Member; (ii) except as provided below, shall bear interest at an annual rate equal to prime plus three percent (3%) adjusting when and as the Prime shall adjust, compounded annually; and (iii) each such loan shall mature and be due and payable to the extent not paid and payable to the extent not paid pursuant to other provisions of this Agreement upon the termination of the Company.

Thus, notwithstanding the absence of precisely agreed-upon loan terms, BEI and Bootheel could rely on the terms provided in the Operating Agreement in addition to the agreed-upon terms that were, pursuant to § 6.2.3, "otherwise agreed by the Operating Manager and the lending party [BEI]." Furthermore, plaintiff maintains that, here, the oral contract was significantly more certain than the alleged oral contract in *Dennis Chapman Toyota*, which the court found lacked any interest rate, repayment terms, and duration. The terms here, according to plaintiff, are (1) prime plus three percent interest (the Operating Agreement term), (2) the amount was anything in excess of BEI's 49% contribution (according to the Operating Agreement), (3) the duration was that the debt came due either when Bootheel obtained financing or when the project "folded" (as agreed upon by BEI and Bootheel and allegedly understood by SEMO), and (4) the means of repayment was from Bootheel's funds or from SEMO or its successors.

9

The Court is "guided by principles of law applied with common sense and in light of experience when determining whether the terms are too uncertain to create an enforceable contract." *Scott v. Public School Retirement Sys. of Missouri*, 764 F. Supp. 2d 1151, 1162 (W.D.Mo. 2011). Looking to "the intention of the parties as expressed or manifested in their words or act," *Karsch*, 807 S.W.2d at 99, the Court finds that the terms of the oral agreement between BEI and Bootheel were sufficiently certain and certainly "capable of being made certain." *Tom's Agspray, LLC*, 308 S.W.3d at 259.

Although defendants state that the "obligated party" was not agreed upon between Adcock and O'Neill, this Court disagrees — both Adcock and O'Neill believed that SEMO would be responsible for its share of the loans if the deal collapsed.[5] The Court is mindful of Adcock and O'Neill's apparent disconnect (despite the fact that the Complaint's allegations would support O'Neill's view) with respect to the interest rate and duration. It appears that the minor disagreement about the interest rate, if any, was inconsequential because it is clear that a commercially reasonable interest rate was meant to apply: whether 8% or prime plus 3%, the rate would have been commercially reasonable. Further, SEMO agreed to the prime plus three interest rate for loans in the Operating Agreement. As for the duration, "the failure of an oral loan agreement to specify a time for repayment does not render such agreement too indefinite to be enforceable as a matter of law." *Hughes v. Hughes*, 994 S.W.2d 103, 108 (Mo. Ct. App. 1999) (collecting cases). In addition, the duration question became a non-issue because, in any event and even in Adcock's mind, the loan came due when the deal collapsed. Although Adcock said

---

[5]"The witnesses may speak their own language if, with its background and context, their thought and meaning are clear and the contract is adequately and definitely proven on the whole record." *Sportsman v. Halstead*, 147 S.W.2d 447, 454 (1941).

that he "thought" the promissory notes controlled, it is clear that, in his mind, the terms of the promissory notes had been altered, too, because he expected the loans could or would be repaid from SEMO's capital contribution (which would only occur if the deal collapsed). Furthermore, "what a person may have intended subjectively is not controlling. The standard is what a reasonably prudent person would be led to believe from the actions and words of the parties and this is a question to be resolved by the trier of fact." *Silver Dollar City, Inc. v. Kitsmiller Const. Co., Inc.*, 931 S.W.2d 909, 914 (Mo. Ct. App.1996).

There seems no question, at least, that the terms of the loan, if not precise, were "capable of being made certain," as required by Missouri law. *Tom's Agspray, LLC*, 308 S.W.3d at 259. And, as to the contract term most pertinent to the case at hand — that SEMO would be provisionally liable for payment of the loans — there was full agreement: Adcock and O'Neill agreed that, to the extent that Bootheel was unable to repay the loans from its assets, SEMO would be responsible.

Although defendants want "the interest rate, due date, source of repayment, amount, and other material terms...spelled out," the defendants forget that, although an oral contract's content must be definite, its terms need not necessarily be detailed. *Sportsman v. Halstead*, 147 S.W.2d 447, 452 (1941). Indeed, as the Missouri Supreme Court has recognized, "to require accuracy of expression on the part of lay witnesses...would make impossible the establishment of such oral contracts by the untutored." *Id.* at 454, *quoted by* Scott, 764 F. Supp. 2d at 1161. And, again, as the Missouri Supreme Court has noted, the precision of the witnesses' language is not necessarily an issue if, in context, "their thought and meaning are clear and the contract is adequately and definitely proven on the whole record." *Sportsman*, 147 S.W.2d at 454.

Recently, a recent federal court applying Missouri law held that, although the defendants claimed that an alleged oral contract was not sufficiently definite to survive summary judgment, "a reasonable factfinder could conclude that the terms of the contract [were] definite." *Scott*, 764 F. Supp. 2d at 1162. The same is true here. *Dennis Chapman Toyota* is distinguishable because, among other things, the jury could find that any "missing" terms of BEI and Bootheel's oral agreement were provided by the Operating Agreement — to which SEMO was a party.  A jury could conclude that the terms of the agreement were as articulated by plaintiffs, and summary judgment is therefore inappropriate.

### 2. Whether BEI Made Loans or Capital Contributions

Next, defendants assert that Adcock changed the loans to capital contributions before September 6, 2006, when SEMO dissolved, such that there were no loans on the books for SEMO to repay. The facts surrounding this issue are confusing. On the one hand, as plaintiff argues, the Operating Agreement required that the ownership percentages for BEI and SEMO be 49% and 51 %, respectively. But on the other hand, BEI and SEMO's ownership percentages as reflected on 2005 tax returns shows that SEMO's "capital share" was 5.58% while BEI's was 94.42%.  Further, BEI's contributions from 2005 and 2006 were treated as capital contributions (not loans) on tax returns.

Plaintiff argues that changes in categorization does not control the substance and character of the underlying agreement for those "contributions."  Plaintiff explains that it was SEMO board member Mike Mills who first demanded that the financial statement be changed so as not to show any BEI loans, and Adcock left it up to his accountant to determine whether such a change was proper. Defendants counter that suspicious practices were afoot, as O'Neill had his

12

accountant change all of BEI's contributions back to loans after this lawsuit was filed. O'Neill also testified that, up until September 6, 2006, he never differentiated between capital contributions and loans to Bootheel.  Plaintiff maintains that because the Operating Agreement set the ownership percentages, the contributions were in fact loans, not capital contributions. Ultimately, plaintiff argues that a jury "could find that the confused financial documentation was a product of the parties' ignorance of accounting practices and the accountants' disconnect as to the actual financial state of affairs, rather than an accurate reflection of how the parties intended to treat this money."  The Court agrees that this disputed issue is best left to the trier of fact.

### 3. Whether the Oral Contract was Prohibited by the Escrow Agreement

Defendants also argue that the alleged oral contract was prohibited by the Escrow Agreement, inasmuch as it would have required that BEI's loans be repaid out of the escrowed funds, which (pursuant to the Escrow Agreement), had to be distributed to the members unless certain conditions were met. Plaintiff, however, observes that, under the Operating Agreement between BEI and SEMO, Adcock had the authority to alter the terms of loans with members, and that one such changeable term was whether there was a right to recourse or contribution against any other member. Plaintiff maintains that the Escrow Agreement — which was between the bank and SEMO — had nothing to do with SEMO's obligations under the Operating Agreement. This Court agrees.  To be sure, SEMO's liability under the Operating Agreement may have jeopardized the members' obligation to claim the New Generation Cooperative Tax incentives, but that liability would not have exposed SEMO to any claim by the escrow agent.  The defendants do not argue otherwise.

### 4. Whether "Capital Contribution" was Available for Loan Repayment

13

Defendants take their next argument a step further by arguing that because the $3 million in escrowed funds were never treated as a capital contribution, and because the SEMO members (not SEMO or Bootheel) allegedly owned the escrowed fund, that money was all the more unavailable for use in repaying BEI's alleged loans. However, the interest on that escrowed money was transferred to Bootheel to fund SEMO's portion of Bootheel's operating expenses, so the escrowed money was not completely out of SEMO's hands. In addition, plaintiff has put forth evidence (by way of a check from SEMO for more than $3 million to pay for cashier's checks which were then used to refund the escrowed money to SEMO shareholders) that SEMO did have control over the escrowed funds.

Defendants also try to make use of § 347.099 RSMo, which prohibits one member from forcing another member to make a capital contribution. This Court applied that statute in its memorandum addressing defendants' motion to dismiss. (#42.) That section states that

> A member's obligation to make a contribution shall not be enforceable by a third party creditor of the limited liability company or any other member unless the member so obligated to make such contribution has specifically agreed or consented to such enforcement or the limited liability company has assigned such member's obligation to the creditor or creditor's seeking to enforce the obligation.

§ 347.099(3) RSMo. However, as the Court has already explained, a disputed issue of fact exists with respect to the alleged oral contract and SEMO's obligations thereunder, so as to trigger the exception in § 347.099(3).  Summary judgment is therefore inappropriate.

### 5. Whether SEMO's Members Could Be Held Responsible

The defendants' final argument with respect to plaintiff's breach of oral contract claim is that to the extent the agreement was that SEMO *members* would repay the loans to BEI, Adcock had no authority to so-bind SEMO members (who are separate and distinct from SEMO itself).

14

Again, however, the Operating Agreement permitted Adcock to permit recourse against Bootheel's members, which included SEMO, and SEMO's assets may have included the funds it held in escrow. Now that SEMO has been dissolved, the question of successor liability arises, but that question has not been briefed by the parties. Regardless, the real question at this stage is whether Adcock had authority to bind SEMO under the Operating Agreement, and this Court holds that he did pursuant to § 6.2.3.

In sum, the motion for summary judgment will be denied on the breach of oral contract claim.

### B.    Fraudulent Conveyance

Plaintiff's second claim is that the individual defendants are liable for fraudulent conveyance because (1) they knew SEMO made its capital contributions to Bootheel through the escrowed deposits; (2) they knew SEMO had agreed not to withdraw its capital contribution without BEI's consent and without giving 30 days notice to Adcock; (3) notwithstanding that knowledge, they agreed to and did withdraw all of SEMO's capital contribution from escrow without consent or notice; (4) they engaged in that conduct with the intent to hinder, delay, or defraud; and (5) the transfer made SEMO insolvent and unable to meet its financial obligations.

Because fraudulent intent is rarely proven through direct evidence, Missouri courts have determined the presence of fraud by looking for particular "badges of fraud." *Taylor v. Clark*, 140 S.W.3d 242, 251 (Mo. Ct. App. 2004). Those "badges of fraud" include:

> 1) a conveyance to a spouse or near relative; 2) inadequacy of consideration; 3) transactions different from the usual method of transacting business; 4) transfers in anticipation of suit or execution; 5) retention of possession by the debtor, 6) the transfer of all or nearly all of the debtor's property; 7) insolvency caused by the transfer; and 8) failure to produce rebutting evidence when circumstances surrounding the transfer are suspicious.

15

*Id.* In addition, "[m]ore than one badge of fraud must be present" to infer fraudulent intent. *Id.*

Defendants submit that they are entitled to summary judgment on this claim because, they argue, no "badges of fraud" exist with respect to the subject transaction. Plaintiffs point to "at least three" badges of fraud: First, at least 24 of the 100 shares of SEMO were held by individual defendants or their family members or entities. Second, SEMO received no consideration for disgorgement of the escrow account. And third, all of SEMO's assets were, in effect, plundered, causing insolvency.  The Court also notes that there is a dispute of fact, based on testimony from O'Neill and Adcock, that SEMO's board knew it was obligated to repay BEI's loans, thus the nearly overnight evaporation of the escrowed funds raises suspicion.  As a result, the Court will not grant summary judgment to defendants on plaintiff's fraudulent transfer claim.

### C. Spoliation

As indicated above, the Court will address defendants' spoliation claims in response to defendant's motion to compel and for sanctions, filed May 18, 2011 (#80), rather than as raised as part of defendants' motion for summary judgment.

### IV. Conclusion

The defendants' motion for summary judgment will be denied. Both of plaintiffs claims remain for trial.

Accordingly,

**IT IS HEREBY ORDERED** that  the defendants' Motion for Summary Judgment (#74), filed May 9, 2011, is **DENIED**.

Dated this   30th   day of September, 2011.

_____
UNITED STATES DISTRICT JUDGE