UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| BOOTHEEL ETHANOL INVESTMENTS, L.L.C., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 1:08-CV-59 SNLJ |
| SEMO ETHANOL COOPERATIVE, ET AL., | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER**

This is a contract and tort action by plaintiff Bootheel Ethanol Investments, L.L.C.

("BEI") against defendants SEMO Ethanol Cooperative ("SEMO") and others[1] in connection

with certain financial transactions concerning their limited liability company, Bootheel Ethanol,

L.L.C. ("Bootheel"). BEI alleged in its amended complaint that defendants owed BEI more than

$1 million in loans that BEI allegedly made to Bootheel. This matter is before the Court on the

defendants' Motion to Compel and for Sanctions (#80), filed May 18, 2011. Responsive

pleadings have been filed, and the matter is now ripe for disposition.

I.      **Summary of the Case**

As the Court's Order denying summary judgment (#92) indicates, the factual background

of this case is disputed and complicated. Essentially, plaintiff and defendant were the two sole

members of Bootheel, with BEI as the minority (49%) member, and defendant SEMO the

majority (51%) member. The parties formed Bootheel to build and operate an ethanol-

manufacturing facility in Malden, Missouri. The parties and Bootheel were formed in 2001.

---

[1]The other defendants are the members of defendant SEMO's board of directors: Quincy
Murphy, Mike Mills, John Story, Marty Hutcheson, and Dale Mayberry. They will be
hereinafter be collectively referred to as the "individual defendants."

Operating Manager for Bootheel, Bill Adcock, was also a part-owner of BEI, along with David

O'Neill, who (through his various entities) provided the funding for BEI's stake in and the

alleged loans to Bootheel. This case centers around the existence of an alleged oral agreement

between Bootheel (through Adcock) and BEI (through its manager, O'Neill) for BEI to loan

money to Bootheel. Plaintiff BEI alleges that Bootheel agreed (pursuant to the Operating

Agreement between BEI and SEMO) that SEMO would repay its share of BEI's loans to

Bootheel if Bootheel itself was unable to repay BEI. Plaintiff alleges, however, that SEMO —

which voted to dissolve in September 2006 — has refused to repay BEI for the alleged loans.

Plaintiff thus brought claims of breach of contract against defendant SEMO (Count I) and

fraudulent conveyance by the individual defendants (Count II).

## II.        Discovery Disputes

This is the first motion to compel filed by either party in this now three-year-old case.

Defendants raise numerous issues in their Motion. The facts for each of those disputes are as

follows:

### A.        Spoliation of Evidence — Bootheel Office Computer

Bill Adcock, who was Operating Manager for Bootheel and part-owner of plaintiff BEI,

testified at his first deposition that the computer he used in Bootheel's office was destroyed by a

tornado. Notably, in plaintiff's complaint, plaintiff alleges that one or more *defendants* "caused

the disappearance of Bootheel's Missouri office computer containing voluminous electronic data

relevant to the project and Bootheel and [BEI's] potential claims against SEMO." (#28 at ¶ 43.)

However, after another Bootheel employee testified at her deposition that the computer was not

destroyed in a tornado and that, rather, it was removed from the office by Adcock, Adcock

admitted in a subsequent deposition that he had taken the computer from Bootheel's offices.

(The Court notes that, apparently, the Bootheel trailer which served as the company's office was

2

in fact later destroyed by a tornado.)  Adcock also admitted that the computer had "completely

crashed," and that after Office Depot analyzed it and told him "it could not be retrieved and was

beyond repair," he kept it in his home office for a year and a half and then took it to his county's

"electronic disposal collection" in an effort to "clean house."  That disposal took place sometime

in 2009.

Adcock said that he did not think that the laptop had information related to this lawsuit

on it because it "was dead" and he "couldn't even boot it up for the Internet." He did not retain

the harddrive from the computer.  Emails sent from his personal email address on that computer

were backed up by his internet service provider, and Adcock stated that he made copies of those

emails and submitted them.  However, emails from other Bootheel-related accounts were

retained in the computer harddrive.  Adcock did not know whether Bootheel had backed up the

company computers onto an external harddrive.

**B.** **Spoliation of Evidence — Documents**

Adcock also testified that he removed two or more boxes of company documents from

Bootheel's offices and transported them to his home in North Carolina, where he promptly

disposed of them at a dump after concluding that "they were of no value."  That disposal took

place sometime before O'Neill told Adcock that BEI intended to sue SEMO.  According to

Adockc, the documents related to "projections put together by Ambitech and failed efforts to

fund a project that was no longer viable."  Plaintiff explains that those documents were from

engineering and construction firms which had been retained by Bootheel.  Thus, Adcock said

that he concluded that the documents were of no value to anyone for any purpose when he

disposed of them.

## C. Damages Calculations and Rule 30(b)(6) Depositions

Initial disclosures were due in this case on February 26, 2010. Defendants state that plaintiff served its initial disclosures on March 12, 2010 and stated that "BEI is seeking compensatory damages of $1,276,000, representing the amount of money loaned by BEI to Bootheel and not repaid, plus contractually-agreed interest at prime plus three percent …." On August 4, 2010, in response to defendants' interrogatories request, BEI indicated it was still calculating its damages. Defendants state "BEI has never supplemented this answer." On March 18, 2011, BEI produced Supplemental Rule 26(a)(1) Disclosures which indicated that BEI's claimed compensatory damages in the case were $1,184,000, representing money loaned by BEI to Bootheel from 2005 through 2006.

Defendants deposed O'Neill as BEI's Rule 30(b)(6) representative. That deposition (which was consolidated with O'Neill's personal deposition) took place on March 21, 2011, but that deposition had to be continued for 10 days because O'Neill testified that certain responsive documents had not been produced. Plaintiff supplemented its document production on March 25. Then, at the March 31 rescheduled deposition, defendants say that O'Neill (as BEI's corporate representative) "was unable to calculate [BEI's] damages...or even testify as to the amount of BEI's damages."

Also at the March 31 O'Neill deposition, defendants learned that BEI had not produced any information it provided to its accountant. When those documents were eventually produced on April 8, 2011,[2] the production entailed 902 pages and included documents that defendants say would have been useful at depositions that had already been taken. (Plaintiff asserts that the

---

[2]Defendants do not state what date the production was made, but because they say that the documents were produced on the same day as Amy Schatz's deposition, the Court presumes (from information on the Schatz deposition transcript) that the production was made on April 8, 2011.

documents consisted mainly of previously-produced tax returns, however, with relatively few

pages of new documents.)  Defendants requested an extension on their expert report deadline

(which was two days before the documents' production), but plaintiff apparently refused.  (The

Court notes that defendants did not move the Court for an order granting an extension of the

deadline at that time.)

Finally, defendants complain that plaintiff updated its damages calculations a final time

by serving a Second Supplemental Rule 26(a)(1) disclosure,[3] which provided a damages

calculation of $865,801.64 and attached a spreadsheet showing dates, amounts, and interest as

calculated by counsel.

Defendants contend that these delays (and O'Neill's inability to testify cogently on BEI's

damages calculations) caused defendants to incur costs that would not have otherwise been

incurred.  Defendants request that, as a sanction, the Court preclude the introduction of damages

evidence by BEI.  If the Court does not award such a sanction, the defendants request an

opportunity to produce evidence as to the amount of additional fees and costs incurred as a result

of the delays.  Plaintiff has offered to pay up to $3,000 in expert fees for defendants' expert's

time in revising his report as a result of the delays.  Further, plaintiff consented to make O'Neill

available for another 30(b)(6) deposition.

**D.      Production of Other Documents and Things**

BEI failed to produce bank records for a Southern Bank account in North Carolina, which

held the funds and received deposits for Bootheel after Adcock closed Bootheel's account at

First Commercial.  Rather, many of those documents were obtained via a subpoena to BEI's

---

[3]Oddly, defendants did not attach this supplemental disclosure or state what the revised damages calculation was; instead, plaintiff attached it to its response.

accountant.  Defendants do not explain how they were prejudiced by this delay or whether it affected their expert's report.

Finally, during Adcock's second deposition on April 12, 2011, he produced a key that was supposed to unlock Bootheel's offices in a waste treatment plant in Malden.  Defendants say that Adcock should have produced the key during his first deposition.  However, when defense counsel drove to tour the facility, the key would not open the offices. Plaintiff's counsel explained that Adcock had given him the wrong key and that plaintiff's counsel now has the correct key. (No further update has been provided on this issue.)  Defendants do not demand any particular remedy with respect to this situation, except they offer it as further example of plaintiff's discovery missteps.

## III.    Discussion

Defendants' motion seeks a broad range of sanctions for a broad range of alleged discovery misconduct.  The sanctions sought by defendant are for both the alleged discovery violations in the aggregate and for violations in particular.  The Court will attempt to address each general violation — and the sanction sought — in turn.

### A.    Spoliation of Evidence

As a sanction for Adcock's disposal of the Bootheel computer and certain documents, defendants want the Court to (1) grant summary judgment to defendants, (2) dismiss pursuant to Federal Rule of Civil Procedure 41(b) for failure to comply with a court order, or (3) permit an adverse inference instruction based on the destruction of evidence.  Plaintiff makes light of Adcock's disposal of the computer and documents and asserts that no sanction is justified.

#### 1.    The Computer

With respect to the computer the Court agrees that Adcock's behavior — in light of being actively represented by counsel in litigation which claimed that the defendants were responsible

for taking the laptop — is troubling to say the least. Although the computer had "completely crashed" and was "dead" according to Adcock, there is no indication that the hard drive itself was not recoverable. Adcock — half owner of plaintiff — had custody and control over the computer apparently at the time the litigation was filed. Plaintiff's counsel presumably discussed the need to preserve documents with plaintiff, and, indeed, plaintiff knew that the computer was important because plaintiff alleged in its complaint that the *defendants* had taken it. The very idea that Adcock, who was, again, an owner of plaintiff, could have the computer at the time of the filing of the Amended Complaint and not turn it over to counsel (whether it was functional or not) defies logic. That he would rely on undocumented analysis by Office Depot employees — who may not have been opining as to the accessibility of the hard drive's contents but rather to the computer's ability to function as a whole, and who of course have no interest in retrieving data for a litigation — when he could have turned the entire matter over to his attorneys, is all the more unfathomable. Adcock's culpability even more suspect due to the fact that he at first blamed the computer's disappearance on a tornado.[4]

District courts may impose sanctions when a party destroys evidence that it knows or should know is relevant to potential litigation and thereby prejudices its potential adversary. *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir.1993). Bad faith must also be present, as "there must be a finding of intentional destruction indicating a desire to suppress the truth." *Menz v. New Holland North America, Inc.*, 440 F.3d 1002, 1006 (8th Cir. 2006) (quoting *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004)). The level of sanction applied for spoliation is a matter of degree and left to the discretion of the trial court. *Dillon*, 986 F.2d at 267.

---

[4]Again, a tornado did apparently destroy the Bootheel office, but the Court infers that the computer was not in the office at the time because Adcock had already removed it.

Plaintiff contends that sanctions are inappropriate because a "party can only be

sanctioned for destroying evidence that it had a duty to preserve." *Consolidated Aluminum Corp.*

*v. Alcoa, Inc.*, 244 F.R.D. 335, 339 (M.D. La. 2006). It is clear, however, that by the time

plaintiff destroyed the computer, plaintiff (or Adcock) knew or should have known that the

computer contained discoverable information. Plaintiff's allegations regarding *defendants'*

supposed theft of the computer are all that need be considered in making that determination.

Plaintiff further contends Adcock's behavior was insulated by Rule 37(e), which states:

"Absent exceptional circumstances, a court may not impose sanctions under these rules on a

party for failing to provide electronically stored information lost as a result of the routine,

good-faith operation of an electronic information system." The problem, however, is that it

cannot now be said that information was lost due to routine, good-faith operation of the

computer. It is not known whether the "electronically stored information" was lost at all — all

that is known is that Office Depot supposedly confirmed what Adcock said, which is that the

computer would not boot up. Any number of issues could have caused that problem without

affecting the information stored on the computer's hard drive.

The Court's inquiry on this matter therefore hinges on Bill Adcock's intent. "Intent is

rarely proved by direct evidence, and a district court has substantial leeway to determine intent

through consideration of circumstantial evidence, witness credibility, motives of the witnesses in

a particular case, and other factors." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 902 (8th Cir.

2004), *cited by Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007). On the one

hand, plaintiff appears to argue that Adcock acted in good faith by attempting to have the

computer recovered himself (by taking it to Office Depot, which analyzed the computer free of

charge). Again, plaintiff characterizes this as a simple "failure of technology," relying on Rule

37(e), for which Adcock is blameless. However, due to the timing of the disposal of the computer, Adcock's early misrepresentations about what happened to the computer (*i.e.*, that the tornado destroyed it), and the ease with which Adcock could have simply told his attorneys about the situation, the Court finds that an adverse inference instruction is likely appropriate. The Court will make that determination, however, at trial, after the Court has heard live testimony on these issues.

### 2. The Documents

An adverse inference instruction may also be appropriate with respect to the boxes of documents that Adcock disposed of. Although plaintiff maintains that the documents Adcock destroyed were nothing but materials related to construction and financing contracts with third parties (which could have been and likely were obtained from third parties), the Court understands defendants' skepticism given plaintiff's earlier misrepresentations about Adcock's disposal of the computer. Also relevant is the timing of the disposal of the documents and whether Adcock knew or should have known that he had a duty to preserve the documents in anticipation of litigation. Again, the Court will base its adverse inference instruction determination on "consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors" to be gleaned at trial. *Morris*, 373 F.3d at 902.

### B. Discovery Defects

Defendants seek a variety of sanctions (mostly related to monetary sanctions of fees and costs associated with discovery) for several alleged discovery defects, including late production of documents, late disclosure of damages calculations, and issues surrounding plaintiff's Rule 30(b)(6) representative and other depositions.

### 1. Damages Calculation Disclosure

Plaintiff BEI served its Rule 26 disclosures, which included a damages calculation, and

then updated those disclosures twice. The second and final update occurred on May 2, 2011,

which was the last day of discovery. Defendants complain that BEI "failed to timely provide a

damages analysis in its Rule 26 disclosures."[5] Ultimately, it seems that defendants are

complaining that the final damages disclosure came too late because their rebuttal damages

expert had already finalized his report. But plaintiff has offered to pay for the expert's time to

revise his report — in fact, according to the correspondence, plaintiff asked for an estimate of the

cost for such a revision, defendants answered that it would probably cost $2,500 to $3,000, and

then plaintiff offered to pay up to $3,000. Because plaintiff supplemented his Rule 26

disclosures as the rule requires, and because plaintiff supplemented its disclosures within the

discovery window and then offered to pay defendants' resulting costs as a result of the relatively

late disclosure, the Court does not agree that defendants have been truly prejudiced. Moreover,

the damages calculation was actually lowered with every supplemental disclosure — from

$1,276,000 plus interest initially, to $865,801.64 at the final calculation. Defendants will be

permitted to prepare and serve a revised expert report, and plaintiff shall pay up to $3,000 of that

expense.

### 2. Plaintiff's Rule 30(b)(6) Representative

Federal Rule of Civil Procedure 30(b)(6) permits a party to depose an "entity," and the

organization must then "designate one or more officers, directors, or managing agents" to

"testify on its behalf." The party taking the deposition "must describe with reasonable

---

[5]Defendants seem to indicate that plaintiff should have supplemented its interrogatory responses with respect to its damages calculations, also, but neither party develops that issue in the briefing. As a result, the Court will focus on the Rule 26 disclosures.

particularity the matters for examination." Fed. R. Civ. P. 30(b)(6). "The person[] designated

must testify about information known or reasonably available to the organization." *Id.*

Defendants notified plaintiff BEI that it planned to take BEI's deposition pursuant to

Rule 30(b)(6) on March 16, 2011 on more than 70 topics. David O'Neill was designated as

BEI's corporate representative. O'Neill's deposition was continued twice and, defendants say,

may need to be set for a fourth time if this Court permits plaintiff to submit evidence of its

damages at trial. Defendants state that the reason O'Neill's 30(b)(6) deposition was reset was

due to (1) O'Neill's testifying that BEI had not produced all the documents it had in its

possession or control in response to defendants' document requests; (2) O'Neill was not as

familiar with BEI's ledger as he should have been; (3) O'Neill was unable to calculate BEI's

damages or testify as to their amount; and (4) at the second deposition, O'Neill revealed that BEI

had provided its accountant with information responsive to the discovery requests that had not

been produced (and those documents — 902 pages — were produced eight days later), which

apparently required a third deposition be scheduled on April 27.[6] Then, plaintiff served its

supplemental damages disclosure on May 2, which defendants insist requires a fourth deposition

of O'Neill to explain the damages calculations. Instead, however, defendants argue that plaintiff

should be prohibited from presenting evidence of its damages at all at trial as a sanction for the

above conduct.

Plaintiff explains that, although counsel performed the actual calculations to arrive at the

damages total, O'Neill did testify as to how that number was reached. Defendants' counsel was

able to articulate the method of calculation back to him, and O'Neill was able to explain:

---

[6]The Court sees that, according to the excerpts of deposition transcripts that were filed
with the Court, O'Neill was deposed on March 21 and March 31, 2011. It appears that,
according to a transcript excerpt filed with the Court as part of the summary judgment briefing,
the third deposition occurred on April 27, 2011.

Q:   So the most accurate way of calculating damages in your theory is to figure out the pro rata share of capital contributions made on some ongoing basis --

A:   Right.

Q:   -- figure out what your overage is, and that's the loan?

A:   Right.

\*\*\*

Q:   All right. So now what I've got is [$]1.184 million, which is the overage. What do we do then?

A:   You divide that by 49 and multiply by 51. You apply interest at the end of each year for the outstanding balance at prime plus 3 percent.

Q:   Starting at the end of 2005 or the beginning of 2005?

A:   Starting at the end of 2005.

Defendants urge the Court to sanction plaintiff under Rule 37(c)(1), which states that if "a party fails to provide information..., the party is not allowed to use that information or witness to supply evidence...at a trial; further, Rule 37(c)(1) permits the Court to further sanction the party "by ordering payment of reasonable expenses, including attorney's fees, caused by the fialure"; "informing the jury of the party's failure"; or imposing sanctions under Rule 37(b)(2)(A)(i)-(vi), which includes "prohibiting the disobedient party from ...introducing designated matters in evidence."

Although Rule 30(b)(6) "aims to prevent a corporate defendant from thwarting inquiries during discovery, then staging an ambush during a later phase of the case," the record does not indicate that plaintiff is preparing any such ambush. *Cedar Hill Hardware and Const. Supply, Inc. v. Insurance Corp. of Hannover*, 563 F.3d 329, 345 (8th Cir. 2009) (quoting *Rainey v. Am. Forest & Paper Ass'n*, 26 F.Supp.2d 82, 95 (D.D.C. 1998)). Although O'Neill may not have provided a concise explanation of interest charges that one might expect of an economics expert, O'Neill was able to articulate the calculation of BEI's damages during his deposition. To the extent plaintiff's May 2 damages calculation disclosure requires defendants to re-depose O'Neill as the Rule 30(b)(6) representative in addition to revising their expert report, defendants may do

so, but the Court does not believe that the plaintiff has forfeited its right to present evidence of damages at trial.

The Court does observe, however, that plaintiff's actions appear to have resulted in expenses for defendants that would not have been incurred had plaintiff simply produced responsive documents earlier, rather than waiting for defense counsel to jog O'Neill's memory. Further, plaintiff's last-minute supplement to its damages calculation may require a fourth Rule 30(b)(6) deposition, which will create additional expenses. The Court will, as requested by defendants, provide defendants an opportunity to provide evidence as to the amount of additional fees and costs incurred as result of the serial delays in taking O'Neill's depositions. Defendants will be permitted to submit to the Court a breakdown of the costs and fees associated with the first, third, and (if necessary) fourth O'Neill depositions; the defendants are urged to carefully and cogently present a summary of the costs along with any supporting documents in order to make their presentation to the Court as clear as possible. Because trial is rapidly approaching, however, the Court will set the due date for any such submission for 14 days after trial has concluded.

### 3.     Bill Adcock Depositions

Defendants also complain that they were forced to take Bill Adcock's deposition a second time. Although defendants to not specifically articulate their reasons for doing so, it seems that they needed to depose him again after learning from a different deponent that Adcock (and not a tornado) had caused the Bootheel office computer to disappear. Defendants also complain that Adcock, when he eventually brought a key to the second deposition that was supposed to unlock the Bootheel office, brought the wrong key, causing defense counsel to waste time and money driving to a facility that he could not unlock. Defendants are therefore also

13

invited to present evidence of their costs associated with the second deposition and with the futile drive to the locked Bootheel office, again within 14 days after trial has concluded.

### 4.    Late Production of Documents

Finally, defendants complain that several categories of documents were produced late such that, as the Court understands it, (1) defendants were deprived of the opportunity to question certain witnesses regarding the documents, and (2) defendants' expert was deprived of the opportunity to review the documents before submitting his report. The Court has already addressed the matter of defendants' expert. However, as for any deponents whom defendants would like to question regarding certain later-produced documents, defendants should be permitted to retake those depositions. The Court will not order that the plaintiff pay the fees and costs associated with those depositions at this time, but the defendants may file a motion seeking reimbursement of costs and fees (and clearly detailing the reasons why re-taking the deposition was necessary and summarizing and supporting the expenses associated with the deposition) should they choose to do so.

## IV.    Conclusion

The defendants' motion to compel and for sanctions will be granted in part and denied in part. The Court expects that the parties will still be ready for trial as scheduled. However, should the parties need to address scheduling with the Court, they are invited to either file a motion or request a telephone conference.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion is granted in part and denied in part;

**IT IS FURTHER ORDERED** that plaintiff shall make David O'Neill available for a fourth deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), and that Mr. O'Neill shall testify as to the damages calculations submitted in plaintiff's Second Supplemental Rule 26 submission;

**IT IS FURTHER ORDERED** that defendants shall submit to the Court within 14 days after conclusion of trial in this matter a memorandum concisely summarizing and supporting the fees and expenses incurred as a result of the first, third, and, if applicable, fourth depositions of David O'Neill, and the second deposition of Wilton "Bill" Adcock;

**IT IS FURTHER ORDERED** that defendants shall be permitted to prepare and submit a revised expert report and that plaintiff shall pay the expenses of that revision up to and including $3,000;

**IT IS FINALLY ORDERED** that defendants shall be permitted to re-depose any deponent regarding documents that were produced after that deponent's deposition.

Dated this ___30th___ day of September, 2011.

_____
UNITED STATES DISTRICT JUDGE